CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
SEP 04 2014
JULIA C. DUDLEY, CLERK
BY: /s/ DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | |
|---|---|
| RHONDA T. MCBETH, ) | |
| ) | Civil Action No. 1:12CV00086 |
| Plaintiff, ) | |
| ) | **MEMORANDUM OPINION** |
| v. ) | |
| ) | Hon. Glen E. Conrad |
| SHEARER'S FOODS, INC., ) | Chief United States District Judge |
| ) | |
| Defendant. ) | |

The plaintiff filed this action against her former employer, alleging violations of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601 to 2654, and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e to 2000e-17. The case is presently before the court on the defendant's motion for summary judgment. For the reasons set forth below, the motion will be granted.

## Factual Background

The following facts are either undisputed or, where disputed, presented in the light most favorable to the plaintiff. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (noting that all evidence must be construed in the light most favorable to the party opposing summary judgment).

On October 28, 2010, Shearer's Foods, Inc. ("Shearer's") hired the plaintiff, Rhonda Taylor McBeth, to work as a Human Resource Generalist at its snack food manufacturing facility in Bristol, Virginia. McBeth received a starting salary of $60,000. Less than three months later, on January 19, 2011, McBeth was promoted to the position of HR Manager and given a $10,000 raise. At that time, McBeth was the highest paid HR Manager in the company.

During her employment with Shearer's, McBeth reported directly to Michael Shearer ("Shearer"), the Corporate Director of Human Resources, with a "dotted-line report" to Pam Herman, the Plant Manager of the Bristol facility. Shearer Aff. ¶ 8, Docket No. 25. Shearer, in turn, reported to Walt Fink, the Vice President of Human Resources. Both Shearer and Fink worked primarily from the defendant's corporate headquarters in Ohio.

Around the same time that she was promoted to HR Manager, McBeth began advocating for the vacant position of Safety Specialist to be filled. Her fiancé at the time, Richard McBeth ("Richard"), had previously applied for the position. Richard was interviewed at the facility by McBeth, Herman, Sean Mitchell, and Greg Kennedy on February 4, 2011. Neither McBeth nor Richard indicated during the interview that they were engaged.

On February 7, 2011, McBeth sent Shearer an email advising him that Richard had been interviewed for the Safety Specialist position, and that the interview team was of the opinion that Richard would be a good fit for the facility. McBeth noted that Richard's presentation was informative, that he had "experience building a safety program from the ground up," and that he demonstrated a "passion for safety." Bates No. SF 00076, Docket No. 25. The email provided no indication that McBeth knew Richard on a personal level.

Shortly thereafter, Herman advised Shearer that she had learned that McBeth and Richard were engaged, and that she was of the opinion that this was why McBeth had been advocating for Richard to be hired. Although the defendant contends that McBeth affirmatively "denied knowing [Richard] on a personal level" when she was subsequently confronted by Shearer, Shearer Aff. ¶ 19, McBeth maintains that she "at no time . . . attempt[ed] to conceal [her] relationship with Richard." McBeth Decl. ¶ 7, Docket No. 38-8.

2

On February 18, 2011, Shearer advised McBeth and Herman that he was "not overly excited about [Richard's] background and [desired] compensation range," and that they "should keep recruiting for [the] position." Bates No. SF 00087, Docket No. 25. Several months later, on August 10, 2011, McBeth emailed a number of company officials, including Shearer and Fink, and advised them that she would be getting married the following Saturday, and that she wanted to "introduce the groom, . . . Rich McBeth." Bates No. SF 00098, Docket No. 25.

During McBeth's performance review for 2011, Shearer advised her that he had received complaints regarding her ability to work cooperatively with other members of the Bristol management team. Prior to the review, Shearer asked members of the Bristol management team to provide feedback related to McBeth's job performance. McBeth received positive comments regarding her knowledge of HR functions and systems, and her ability to interact with hourly associates. However, the feedback also suggested, as McBeth acknowledged during her deposition, that she was not a "team player" and that she needed to be less confrontational with other members of the management team. McBeth Dep. 125, Docket No. 41. In addition, McBeth "received criticism for providing input into other areas, most notably Safety." McBeth Aff. ¶ 9, Docket No. 38-8. Shearer provided the following summary in McBeth's written review:

> As evident by the 360 feedback and conversations throughout the year, Rhonda needs to focus on building better business relationships with her peers at the Bristol, VA facility. The Plant Manager has been vocal at times during the year on Rhonda's demeanor towards her and other members of the leadership team. At times Rhonda is seen as being difficult to work with and is quick to point out why the facility cannot do something instead of helping to find creative solutions to problems. Again the 360 feedback resonates the same sentiments. Rhonda has both the skill and knowledge; however, her delivery and style are perceived to be counterproductive.

Pl.'s Ex. I, Docket No. 37-9.

3

McBeth was admittedly "taken aback" by the performance review. McBeth Dep. 109, Docket No. 41. After receiving the review, McBeth sent Shearer an email addressing some of the issues that were raised. McBeth emphasized that the review had caught her off guard, but that she was willing to "move forward to do [her] best." Bates No. SF 00104, Docket No. 25. McBeth also noted that her relationship with Herman, the Plant Manager, was improving, and that Herman had provided advice on how to better communicate with her peers. Additionally, McBeth acknowledged that "[t]he safety role [was] not [her] responsibility to manage," and that she was "working very hard on removing [herself] from any aspect of safety management." Id.

On February 10, 2012, Shearer informed McBeth that the company was considering a headcount reduction. He advised her that Shearer's planned to eliminate either the HR Generalist position in Bristol or the HR Manager position, and create a combined position. Shearer asked her to decide which position should be eliminated, and noted that she might be eligible for a severance package if she elected to nominate herself for the reduction. Because a severance package was not guaranteed, McBeth elected to remain with Shearer's and, over the next few weeks, assisted in eliminating the HR Generalist position held by Janice Herrell.

Soon after Herrell was terminated, McBeth began to express concerns regarding her workload. On March 23, 2012, Shearer traveled to Bristol to meet with McBeth about her new job duties and her objectives for the next 90 days. During the meeting, McBeth suggested hiring a part-time HR clerk to assist her in performing her job duties. Shearer explained that this may be an option down the road, but that he was not in support of hiring anyone at that time.

Nonetheless, the following Monday, March 26, 2012, McBeth emailed Shearer and advised him that she had scheduled a meeting with a candidate for a part-time HR position. In response, Shearer instructed McBeth to focus on the goals and objectives that they had discussed

4

during their meeting. He also reminded her that while he was "not opposed to talking about hiring a clerk," he was "not . . . on board" with doing so "at this time." Bates No. SF 00113, Docket No. 25.

The next day, March 27, 2012, McBeth emailed Shearer and Herman, and advised them that she was going to need to have shoulder surgery. She indicated that she did not yet know when the surgery would take place and that she would keep them posted.

On March 28, 2012, Walt Fink received a telephone call from Mike Parks, Vice President of Manufacturing, and Janice Wagner, an Operations Consultant at the defendant's Hermiston, Oregon plant. Wagner informed Fink that Julie Mercer, a Hermiston associate, had recently spoken with Joyce Hughes, the former HR Supervisor at the Hermiston facility, and that Hughes had advised Mercer of certain confidential employment information that she had learned.[1] Mercer further reported that Hughes had identified McBeth as the source of the confidential information, which included certain compensation information for associates at the Hermiston facility.

Fink subsequently spoke to Mercer by phone, and she relayed what Hughes had allegedly told her. On March 29, 2012, Fink sent Mercer an email summarizing the contents of their telephone conversation, and Mercer confirmed that the summary was accurate. He then instructed Shearer to meet with McBeth regarding the allegations.

---

[1] Joyce Hughes was terminated by Shearer's in June 2011. Following her termination, she filed a charge of discrimination with the Oregon Bureau of Labor and Industries, which was ultimately dismissed.

5

Shearer traveled to Bristol to speak with McBeth on April 5, 2012. Unbeknownst to Shearer, McBeth recorded portions of their conversation with her cell phone.[2] During the meeting, Shearer explained that Hughes knew very precise details about various Hermiston associates, and that he had been advised that McBeth was the source of the information. Although McBeth admitted that she had recently spoken to Hughes, she initially denied discussing any specific details about the company. See Tr. of Recorded Conversation 5, Docket No. 22-3 ("I have spoke[n] to Joyce but not on specific details."). Later in the conversation, McBeth recalled that she and Hughes had discussed "a couple people" at the Hermiston facility, and that she had seen compensation records for employees at that facility. Id. at 12, 15; see also McBeth Dep. 26-27 (acknowledging that she accessed and reviewed salary information for employees at the Hermiston facility, including HR Manager Shawn Olsen, and that she had no "business reason" for doing so). However, McBeth denied sharing any employee compensation data with Hughes.

On April 26, 2012, McBeth emailed Shearer and advised him that she would soon be sending him her request for FMLA leave. McBeth noted that she was still waiting to find out the exact date of her shoulder surgery, and that she would let him know as soon as possible. In response, Shearer asked McBeth to see if Janice Herrell would be interested in filling in during her absence. In a reply email sent the following day, Shearer indicated that the company could rehire Herrell as a seasonal employee at the hourly equivalent of Herrell's former salary.

By email dated May 2, 2012, McBeth advised Shearer, Herman, and Fink that her shoulder surgery would be performed on June 12, 2012, that she would need to prep for surgery on June 11, 2012, and that she expected to be off work between six and eight weeks. The next day, she

---

[2] This was the second conversation with Shearer that McBeth secretly recorded. During her deposition, McBeth also admitted to recording a conversation that they had in mid-March 2012. However, she could not recall what was said during the conversation. She also attempted to record a conversation with Fink in May, 2012, but that recording "did not take." McBeth Dep. 14.

6

submitted a Request for Family and Medical Leave of Absence for the following dates: June 11, 2012 to August 6, 2012.

On May 4, 2012, Shearer sent McBeth an email thanking her for communicating her requested leave dates. He reminded her that she would also need to have her doctor complete a certification form, which he attached. In response to additional questions from McBeth regarding the certification form, Shearer emailed her on May 8, 2012, and advised her that she would need to have the form completed within the first two weeks of leave. He recommended that she "get it taken care of sooner so that [she] did not have to worry about it while on leave." Pl.'s Add'l Ex. R-8, Docket No. 38-5.

McBeth testified at her deposition that, in addition to their communications via email, she and Shearer had several conversations regarding her FMLA leave, the particular dates of which she could not recall. During one of the conversations, she asked Shearer when she would need to submit the "appropriate document" to the corporate office. McBeth Dep. 45. According to McBeth, Shearer advised her "that it needed to be turned in as soon as possible, but it did not guarantee any approval of leave." Id. at 46. During another conversation, Shearer allegedly told McBeth that she "would not be eligible to have family medical leave without appropriate timing," and that this "could result in [her] job not being available." Id. McBeth further testified that management ultimately decided not to rehire Herrell to fill in while she was on leave, and that Shearer indicated that McBeth's absence would be a "hardship." Id. at 63.

On May 15, 2012, McBeth participated in a facility walkthrough with Greg Kennedy to look for safety hazards. The safety committee at Bristol initiated this practice after Kennedy was promoted to Safety, Security, and Wellness Manager. The walkthrough lasted approximately thirty minutes.

7

Following the walkthrough, Gregory McDavid, the Production Manager, approached McBeth to discuss changes in the company's hiring strategy. According to the defendant's evidence, McDavid "heard the sound of a tape recorder 'click' and the sound of a tape rewind." McDavid Aff. ¶ 5, Docket No. 22-4. While McBeth denies having a tape recorder, McDavid maintains that he saw her "reach into her left front pants pocket, pull[] out a tape recorder, turn[] it off, and place[] it under a folder on her desk."[3] Id.

McDavid subsequently located Herman in her office and advised her that he had seen McBeth with a tape recorder. Herman and McDavid immediately called Shearer, who instructed them not to confront McBeth until Fink had been advised of the incident.

On the morning of May 16, 2012, Herman and McDavid called Fink, and McDavid relayed what he had allegedly seen. Fink asked McDavid whether he could have mistaken a recorder for something else, to which McDavid responded "no." Id. at ¶ 10; see also Fink Aff. ¶ 45, Docket No. 25-1.

---

[3] During discovery, the defendant produced a typed "Note to File," signed by McDavid, which is consistent with McDavid's sworn declaration. Pl.'s Ex. O, Docket No 38-2. In response to the defendant's motion for summary judgment, McBeth claims that McDavid originally handwrote his statement, and that the handwritten statement was "different" from the typed statement. McBeth Decl. ¶ 3. However, she has not produced any handwritten statement to support this assertion, or explained how she had the opportunity to review any statement prior to receiving the typed statement in discovery. Even assuming that McDavid originally provided a different handwritten statement, it is undisputed that McDavid reported that he saw McBeth with a tape recorder:

Q. Are you aware of what Mr. McDavid claims you did?

A. I'm aware of his allegations.

Q. What's the allegation?

A. He alleges that I had a recorder.

McBeth Dep. 214.

8

Later that morning, Fink and Shearer had a telephone conference with Herman and McBeth. During the phone conference, McBeth denied having a recorder. She claimed that the device was her daughter's cell phone that she needed to take in for repairs. See Fink Aff. ¶ 48; see also McBeth Dep. 217 ("I was asked did I have a recording device that Greg alleges that I did, that he saw it, and I denied it. I stated I did have my daughter's cell phone . . . [that] needed repair."). Although McBeth offered to produce the cell phone for inspection, the offer was declined.

According to the defendant's evidence, Fink, Shearer, and Herman each observed that McBeth seemed nervous and evasive during the call, and did not believe that her explanation was credible. Fink "terminate[d] her . . . on the spot with no input from anyone else." Fink Aff. ¶ 51. He "explained to Ms. McBeth that this was yet another issue related to trust amongst her team members," and that he did not believe that her relationship with other members of the Bristol management team could be salvaged. Id. at 52; see also Compl. ¶ 13, Docket No. 1 ("Plaintiff was advised by management she was being terminated allegedly because she 'could not be trusted.'").

At the time of her termination, McBeth was no longer the company's highest paid HR Manager. Shawn Olsen, who had worked for Shearer's since May 2010 as a Talent Acquisition Manager, was promoted to the vacant position of HR Manager at the Hermiston, Oregon facility. He was given a $6,100 raise, making his salary $83,000.

Following her termination, Shearer's learned that McBeth had filed an anonymous complaint with the Virginia Occupational Safety and Health Administration in March of 2012, which identified 19 alleged safety violations at the Bristol facility. The complaint was resolved with two citations and a $2,100 fine.

9

## Procedural History

McBeth filed the instant action against Shearer's on December 3, 2012. She claims that Shearer's violated the FMLA by terminating her in retaliation for requesting FMLA leave. She also claims that Shearer's violated her rights under Title VII by paying her a lower salary than Shawn Olsen.[4]

Following the completion of discovery, Shearer's moved for summary judgment. The court held a hearing on the motion on June 25, 2014. The motion has been fully briefed and is ripe for review.

## Standard of Review

An award of summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether to grant a motion for summary judgment, the court must view the record in the light most favorable to the non-movant. Anderson, 477 U.S. at 255. To withstand a summary judgment motion, the non-movant must produce sufficient evidence from which a reasonable jury could return a verdict in her favor. Id. at 248. "Conclusory or speculative allegations do not suffice, nor does a 'mere scintilla of evidence' in support of [the non-movant's] case." Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002) (quoting Phillips v. CSX Transp., Inc., 190 F.3d 285, 287 (4th Cir. 1999)); see also Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 252 (3d Cir. 2010) ("[M]ere suspicions are insufficient to

---

[4] In her complaint, McBeth also asserted that she was terminated in retaliation for "allegedly providing assistance to Ms. Hughes relative to Hughes' sex discrimination complaint against defendant." Compl. ¶ 16. However, that claim was abandoned on summary judgment. See Mentch v. Eastern Sav. Bank, FSB, 949 F. Supp. 1236, 1247 (D. Md. 1997) (holding that the plaintiff abandoned her harassment claim by failing to address it in her opposition to the defendant's motion for summary judgment); see also Feldman v. Law Enforcement Assocs. Corp., 955 F. Supp. 2d 528, 536 (E.D.N.C. 2013 ) (finding that the plaintiff had conceded that summary judgment was appropriate on certain claims, since he failed to respond to the arguments raised with respect to those claims in the defendants' memorandum in support of summary judgment).

10

overcome a motion for summary judgment."). In assessing a summary judgment motion, a court may only consider evidence that would be admissible at trial. See Maryland Highways Contractors Ass'n, Inc. v. State of Maryland, 933 F.2d 1246, 1251 (4th Cir. 1991).

## Discussion

### I. FMLA Claim

McBeth first claims that Shearer's violated the FMLA by terminating her in retaliation for requesting medical leave. See 29 U.S.C. § 2615(a); see also 29 C.F.R. § 825.220(c) ("The [FMLA's] prohibition against interference prohibits an employer from discriminating or retaliating against an employee . . . for having exercised or attempted to exercise FMLA rights.").

"FMLA retaliation claims are analogous to discrimination claims brought under Title VII." Laing v. Fed. Express Corp., 703 F.3d 713, 717 (4th Cir. 2013). Accordingly, "a plaintiff may succeed either by providing direct evidence of discrimination or by satisfying the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)." Id. In this case, the plaintiff appears to argue that her claim should survive summary judgment under both approaches. Accordingly, the court considers each in turn.

#### A. Direct Evidence

Direct evidence of discrimination "encompasses 'conduct or statements that both (1) 'reflect directly the alleged discriminatory attitude,' and (2) 'bear directly on the contested employment decision.'" Laing, 703 F.3d at 717 (quoting Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 520 (4th Cir. 2006)). "Thus, evidence is direct if it establishes discriminatory motive with no need for an inference or presumption." Young v. UPS, 707 F.3d 437, 446 (4th Cir. 2013); see also Cline v. Roadway Express, Inc., 689 F.2d 481, 485 (4th Cir. 1982) (explaining that direct evidence of discrimination "may consist of . . . evidence that the employer announced, or admitted,

11

or otherwise unmistakably indicated that [an impermissible consideration] was a determining factor").

In this case, McBeth contends that Shearer, her direct supervisor, displayed a discriminatory attitude after she advised him of her need for medical leave. She cites to portions of her deposition testimony, during which she described three conversations that "made [her] feel uncomfortable with requesting to take family medical leave." McBeth Dep. 30. During the first conversation, McBeth inquired as to when she would need to have "the appropriate document" into the corporate office. Id. at 45. Shearer purportedly responded that the document "needed to be turned in as soon as possible, but . . . did not guarantee any approval of leave." Id. at 46. During another conversation, Shearer allegedly told McBeth that she "would not be eligible to have family medical leave without appropriate timing," and that this "could result in [her] job not being available." Id.; see also id. at 47 (confirming that she was told that she "might not be eligible for leave" if she did not "get the paperwork in on time").

At this stage of the proceedings, the court accepts as true McBeth's account of these conversations. However, even assuming that such statements were made by Shearer, they do not constitute direct evidence of a discriminatory animus. Instead, they are consistent with decisions interpreting and applying the FMLA and its accompanying regulations. These decisions make clear that that "an employee must provide 'adequate' and 'timely' notice of the need for covered leave" before an employer's duty to provide FMLA leave is triggered, Peeples v. Coastal Office Prods., Inc., 64 F. App'x 860, 863 (4th Cir. 2003) (quoting Carter v. Ford Motor Co., 121 F.3d 1146, 1148 (8th Cir. 1997)), and that an employer has the right to require that an employee's leave request be supported by a certification issued by the employee's health care provider. See Rhoads v. FDIC, 257 F.3d 373, 382 (4th Cir. 2001). "When timely and adequate communication is not

12

given, the protections of the [FMLA] do not apply, even if the employee in fact has a serious health condition." Rodriguez v. Smithfield Packing Co., Inc., 545 F. Supp. 2d 508, 516 (D. Md. 2008). Likewise, "the failure to provide a medical certification is an independent basis for denying FMLA leave notwithstanding the appropriateness of that leave." Kinds v. Ohio Bell Telephone Co., 724 F.3d 648, 654 (6th Cir. 2013). Additionally, it is well-settled that there is no "'absolute right to restoration'" following medical leave. Laing, 703 F.3d at 718 (quoting Yashenko, 446 F.3d at 548). While "[e]mployees who show they qualify for FMLA leave are entitled to be restored to their positions or the equivalent upon returning to work[,] [e]mployees who fail to comply with legitimate reporting requirements set by their employees are not entitled to reinstatement, . . . nor are employees who were subject to discharge for reasons other than their requests for FMLA leave." Woods v. DaimlerChrysler Corp., 409 F.3d 984, 991 (8th Cir. 2005) (internal citations omitted).

Because the first two challenged statements are consistent with the foregoing principles, no reasonable jury could find them to be direct evidence of discrimination. See Laing, 703 F.3d at 718 (holding that a management official did not demonstrate a discriminatory animus "when he accurately explained that the FMLA did not 'necessarily' require the company to keep [the plaintiff's] job open"); see also Hughes v. Blue Cross and Blue Shield of Kansas, Inc., No. 12-2339-JTM, 2013 U.S. Dist. LEXIS 95160, at *20 (D. Kan. July 9, 2013) (noting that a supervisor's comment "that the timing [of the plaintiff's FMLA leave] was not good was statutorily permitted" and, thus, not evidence of a discriminatory animus) (citing 29 C.F.R. § 825.302(e)).

The court likewise concludes that no reasonable jury could find the third purported comment – that McBeth's absence was going to pose a "hardship" on the company – to be direct

13

evidence of discrimination. Simply stated, this comment does not reflect any discriminatory attitude, and certainly does not prove, "without inference or presumption," that McBeth was terminated in retaliation for requesting FMLA leave. O'Connor, 56 F.3d at 548-49; see also Nana-Akua Takyiwaa Shalom v. Payless Shoesource Worldwide, Inc., 921 F.Supp. 2d 470, 484 (D. Md. 2013) (observing that "[o]nly the most blatant remarks, [the intent of which] could be nothing other than to discriminate . . . constitute direct evidence of discrimination") (internal citation and quotation marks omitted).

### B. Burden-Shifting Framework

Without the benefit of direct evidence to support her claim under the FMLA, the plaintiff next seeks to rely on the burden-shifting framework set forth in McDonnell Douglas. Under this framework, the plaintiff "must first make a prima facie showing that [she] engaged in protected activity, that the employer took adverse action against [her], and that the adverse action was causally connected to the plaintiff's protected activity." Yashenko, 446 F.3d at 551 (internal citation and quotation marks omitted). "If [the plaintiff] puts forth sufficient evidence to establish a prima facie case of retaliation, and [the employer] offers a non-discriminatory explanation for [the plaintiff's] termination, [the plaintiff] bears the burden of establishing that the employer's proffered explanation is pretext for FMLA retaliation." Id. (internal citation and quotation marks omitted).

In this case, even assuming that McBeth has set forth a prima facie case of discrimination, Shearer's has articulated a legitimate, nondiscriminatory reason for terminating her employment. Specifically, Shearer's maintains that her employment was terminated because it was determined that she secretly recorded a safety walkthrough and then lied about the incident. Shearer's has provided a copy of its Employment Policies and Procedures Handbook, which specifically

14

prohibits "dishonesty," as well as the "[u]nauthorized possession or use of . . . recorders . . . or other electronic devices on Company premises at any time." Bates No. SF 00245-00247, Docket No. 25-1. While McBeth testified during her deposition that she did not recall some of the other provisions of the handbook,[5] she has offered no admissible evidence to dispute the defendant's assertion that the offenses for which she was terminated were violations of existing company policies.[6] Accordingly, the court finds that the defendant has met its burden of demonstrating a legitimate, nondiscriminatory reason for McBeth's termination. See Hanson v. Mental Health Res., Inc., 948 F. Supp. 2d 1034, 1045 (D. Minn. 2013) ("Employee dishonesty is a legitimate nondiscriminatory reason for terminating an employee.") (citing cases); see also Mohamad v. Dallas County Cmty. College Dist., No. 3:10-CV-1189-L-BF, 2012 U.S. Dist. LEXIS 141578, at *27 (N.D. Tex. Sept. 28, 2012) ("[N]umerous courts have upheld the termination of employees for making or attempting to make secret recordings in violation of a company policy.") (citing cases).

Having reached this decision, McBeth bears the burden of establishing at step three of the McDonnell Douglas framework that the defendant's asserted reason for her termination is "pretext

---

[5] For instance, McBeth testified that she did "not recall" the provision of the employee handbook, which prohibits unauthorized access to confidential company information. McBeth Dep. 35.

[6] In her own declaration signed on March 20, 2014, the plaintiff stated that she was "very familiar" with the employee handbook submitted by Shearer's, and that "[t]his handbook contains no policy, or inference of a policy, which prohibits a recording of any conversation." McBeth Decl. ¶ 5. Following the summary judgment hearing, plaintiff's counsel sent the court an email acknowledging that this assertion was incorrect, and that the handbook does in fact prohibit the unauthorized use of recorders. Plaintiff's counsel then argued, in a subsequent email, that the same handbook was not in effect when McBeth was employed by the defendant, and that the defendant had no policy prohibiting employees from recording conversations during her term of employment. However, counsel cited no specific evidence to support either of these assertions, and it is well-settled that counsel's own arguments are "not evidence, and cannot provide a proper basis to deny summary judgment." Pinkerton v. Colo. Dep't of Transp., 563 F.3d 1052, 1061 (10th Cir. 2009); see also Barcamerica Int'l USA Trust v. Tyfield Importers, Inc., 289 F.3d 589, 593 n.4 (9th Cir. 2002) ("[A]rguments and statements of counsel are not evidence and do not create issues of material fact capable of defeating an otherwise valid motion for summary judgment."); Penn v. Citizens Telecom Servs. Co., LLC, No. 2:12-cv-07311, 2014 U.S. Dist. LEXIS 24094, at *17 (S.D. W.Va. Feb. 26, 2014) ("To the extent that [plaintiff's written] response makes unsupported and conclusory assertions, the Court observes that such statements by counsel are obviously not facts or evidence.").

15

for FMLA retaliation." Nichols v. Ashland Hosp. Corp., 251 F.3d 496, 502 (4th Cir. 2001). While McBeth advances several arguments in an attempt to establish pretext, the court concludes that she has failed to create a genuine issue of material fact with respect to this issue.

McBeth first argues that "she never had possession of any gray tape recorder, and that she did not tape record the safety walkthrough in question." Pl.'s Br. in Opp'n 9, Docket No. 37; see also id. at 13-14. This argument, however, misconstrues McBeth's burden. When an employer articulates a legitimate, nondiscriminatory basis for terminating an employee, this court does not "decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." Hawkins v. PepsiCo, Inc., 203 F.3d 274, 279 (4th Cir. 2000) (internal citation and quotation marks omitted). In assessing whether an employer's proffered reason is pretextual, "it is the perception of the decisionmaker which is relevant." Holland v. Washington Homes, Inc., 487 F.3d 208, 217 (4th Cir. 2007).

In the instant case, the plaintiff has failed to proffer evidence from which a reasonable jury could find that Walt Fink, the company official responsible for terminating her employment, did not honestly believe that she had secretly recorded the safety walkthrough. The record establishes that Fink spoke to McDavid about the incident, that he obtained McBeth's side of the story, and that he ultimately decided that McBeth's explanation was not credible and that she could not be trusted. See Fink Aff. ¶¶ 49-51 ("I did not believe Ms. McBeth's explanation was credible. She sounded very nervous and evasive during the call. Ms. McBeth never explained why a broken cell phone would make a clicking and rewinding sound or why she would take it out of her pocket and place it on the desk. I felt that, given this latest incident, Ms. McBeth could not be trusted, there would be no way to rehabilitate the trust issues with the Bristol management team[,] and I decided to terminate her.") While McBeth obviously disagrees with the outcome of the

16

investigation, "such disagreement does not prove that [the] decision to fire her for [secretly recording the safety walkthrough] was dishonest or not the real reason for her termination, which is what is required at step three of the burden-shifting framework." Laing, 703 F.3d at 722. Thus, even if McBeth could show that Fink erred in finding that she engaged in the misconduct at issue, such a showing is not sufficient to demonstrate pretext. See Gibson v. Fluor Daniel Servs. Corp., 281 F. App'x 177, 179 (4th Cir. 2008) (emphasizing that "[a]n employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct") (internal citation and quotation marks omitted).

The court must also reject McBeth's argument that the investigation of the incident in question was inadequate. See Pl.'s Br. in Opp'n 14 (suggesting that Fink should have accepted her offer to provide her daughter's cell phone for inspection). As the United States Court of Appeals for the Fourth Circuit has previously explained, focusing on the quality of the investigation "misses the point," since "[a] federal court 'does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination.'" Cupples v. AmSan, LLC, 282 F. App'x 205, 210 (4th Cir. 2008) (quoting DeJarnette v. Corning, Inc., 133 F.3d 293, 299 (4th Cir. 1998)). Thus, even if management's investigation was substandard, "that does little to help [the plaintiff] establish that the reasons given for her termination were not the actual reasons, and it certainly does not give rise to a reasonable inference that [her request for FMLA leave] was the real reason for the termination." Bonds v. Leavitt, 629 F.3d 369, 386 (4th Cir. 2011).

Finally, the mere fact that McBeth was terminated less than two weeks after submitting her FMLA leave request is insufficient to create a genuine issue of material fact as to the reason for her termination. While timing can be considered in assessing whether an employer's explanation is

17

pretextual, "it is not usually independently sufficient to create a triable issue of fact." Mercer v. The Arc of Prince Georges County, Inc., 532 F. App'x 392, 399 (4th Cir. 2013); see also Laing, 703 F.3d at 720 (holding that the close temporal proximity between the plaintiff's use of FMLA leave and her termination was sufficient to establish the causal nexus required at step one of the McDonnell Douglas framework, but that the plaintiff's evidence was insufficient to support a reasonable jury finding of pretext); Nathan v. Takeda Pharms. Am., Inc., 890 F. Supp. 2d 629 (E.D. Va. 2012) ("[A]s the Fourth Circuit has stated, temporal proximity alone, while perhaps sufficient to establish causation for the purposes of a prima facie case, cannot create a sufficient inference of pretext.").

For all of these reasons, the court concludes that McBeth's evidence fails to create a genuine issue of material fact as to whether Shearer's terminated her employment for requesting FMLA leave. Accordingly, the motion for summary judgment will be granted with respect to this claim.

## II. Title VII Claim

McBeth also claims that Shearer's violated Title VII by paying her a lower salary on the basis of her gender. See 42 U.S.C. § 20000e-2(a)(1). In the absence of any direct evidence of intentional discrimination, McBeth's Title VII claim is analyzed under the McDonnell Douglas burden-shifting framework. See Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 318 (4th Cir. 2005). Under this framework, as set forth above, if the plaintiff puts forth sufficient evidence to establish a prima facie case of discrimination and the defendant offers a legitimate, nondiscriminatory explanation for its employment decision, the plaintiff bears the "ultimate burden" of establishing that the employer's proffered explanation is "pretext for gender discrimination." Taylor v. Virginia Union Univ., 193 F.3d 219, 231-32 (4th Cir. 1999).

In this case, McBeth seeks to establish a prima facie case of gender discrimination by pointing to the fact the she was paid $13,000 less than Shawn Olsen, who was the HR Manager of the defendant's facility in Hermiston, Oregon at the time of McBeth's termination. Even assuming that McBeth could establish a prima face case of discrimination, Shearer's has articulated legitimate, nondiscriminatory reasons for the pay disparity. According to Fink's affidavit, Olsen had been working as a Talent Acquisition Manager for Shearer's since May 2010 at the time he was promoted to the HR Manager position in Hermiston. Because the Hermiston facility had been experiencing considerable turnover, Olsen's background in recruiting made him a "particularly good choice" for the position. Fink Aff. ¶ 10. Fink maintains that he considered a number of factors in determining Olsen's salary, including his prior work history and his particularly relevant master's degree in HR Management. The "most important factor," however, was the fact that Shearer's needed to provide an incentive for Olsen to relocate from Ohio to Oregon. Id.

In her response to the defendant's motion for summary judgment, McBeth maintains that she had "far more extensive experience" than Olsen. Pl's Br. in Opp'n 9. However, she has offered no evidence to rebut the legitimate, nondiscriminatory reasons provided for Olsen's higher rate of pay. In the absence of such evidence, the court concludes that McBeth has failed to establish a genuine, triable issue as to whether Shearer's discriminated against her on the basis of gender. See Graves v. Indus. Power Generating Corp., No. 3:09cv717, 2011 U.S. Dist. LEXIS 871, at *47 (E.D. Va. Jan. 5, 2011) (holding that the employer offered a legitimate, nondiscriminatory reason for another employee's higher rate of pay, and that the plaintiff's argument that the other employee had less experience "could not sustain a showing of pretext"). Accordingly, Shearer's is also entitled to summary judgment on this claim.

## Conclusion

For the reasons stated, the court will grant the defendant's motion for summary judgment. The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER: This 4th day of September, 2014.

*/s/ signature*
Chief United States District Judge